NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

---

JACOB S., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.F., *Appellees.*

No. 1 CA-JV 19-0402
FILED 8-11-2020

---

Appeal from the Superior Court in Maricopa County
Nos. JD 34127
JS 19087
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee, Department of Child Safety*

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

C A M P B E L L, Judge:

¶1        Jacob S. ("Father") appeals the superior court's order terminating his parental rights. He argues there was insufficient evidence to support the court's finding of two statutory grounds—mental deficiency and fifteen months' time in care—and by finding termination is in the child's best interests. Because sufficient evidence supports the court's findings, we affirm.

## BACKGROUND

¶2        Father and Amanda F. ("Mother") have one child in common, Asher F., who was taken into DCS custody shortly after his birth in June 2015 based on reports of mental health issues and concerns that both parents were abusing substances. After Mother completed reunification services, the boy was returned to her care. Father was granted supervised visitation, and the dependency was dismissed in April 2016.

¶3        In April 2017, DCS received a report that Mother was physically abusing the child, using methamphetamine, and exposing the child to domestic violence.[1] DCS located the boy at Father's house in the presence of drug paraphernalia and multiple people who appeared to be under the influence, including his paternal grandmother. DCS immediately removed the child, who was covered in dirt and rashes and had a one- to two-inch scar around his mouth.

¶4        DCS filed a second dependency petition alleging Father was unable to provide proper and effective parental care and control due to substance abuse and neglect. Father denied the allegations, and the case was set for a contested dependency trial.

¶5        DCS offered Father services, including substance abuse testing and treatment, counseling, a bonding and best interests assessment, two parent aides, supervised visitation, and transportation assistance.

---

[1]        Mother is not a party to this appeal.

Father successfully participated in substance abuse treatment. He also completed one parent aide program. However, DCS expressed concerns about the parent aide provider and had ongoing concerns about Father's ability to parent the child adequately. Father suffers from significant learning deficits and is intellectually functioning at a low level. Father was assigned a second parent aide for five months. At the conclusion, the aide noted that Father still could not identify the child's needs or understand how the environment can directly affect the child's risk of harm. Father also lacked the ability to address the child's needs without relying on help from others. Father was terminated from the program unsuccessfully.

¶6        In June 2017, DCS filed a termination petition alleging Father was unable to parent as a result of substance abuse. The superior court set a joint contested dependency and termination hearing for November 2017. At that hearing, Father entered a no-contest plea in the dependency, and the court found the child dependent as to both parents. The court proceeded to sever Mother's rights; however, the court reset Father's severance trial for February 2018 to allow him additional time to participate in services. At that hearing, DCS withdrew the termination petition and the court changed the case plan to family reunification concurrent with severance and adoption.

¶7        In February 2018, Father engaged in a psychological evaluation. Dr. Bluth reported a guarded prognosis regarding Father's ability to parent, finding that Father struggled to recognize safety risks to the child, and recommended that he participate in individual counseling. DCS referred Father for individual counseling.

¶8        The boy was referred for a developmental evaluation after his foster mother reported concerns about his cognition and ability to self-help. The boy struggled with coping skills, and he was fearful of women and crowds. He was evaluated by a developmental team, including Dr. Peruginia, who determined that the child had suffered significant trauma resulting in "pronounced" post-traumatic stress disorder ("PTSD"). She testified PTSD can cause delays in a child's overall development and can affect their cognitive, adaptive, motor, communication, social, and emotional skills. She opined that the child needed a parent who is particularly sensitive to his needs, noting the boy struggles more than a typical child.

¶9        Dr. Silberman conducted a bonding and best interests assessment in November 2018. Dr. Silberman also expressed concerns about Father's ability to parent in light of his mental deficiencies and the child's

special needs. The doctor noted Father either refused to acknowledge or was unable to understand how the drug users he associated with pose a danger to the child. The next month, the child's guardian ad litem ("GAL") filed a second petition to sever Father's parental rights, alleging the statutory grounds of mental illness, fifteen months' time in care, and neglect.

¶10            Shortly thereafter, DCS discovered that Father had been accused of sexually assaulting his younger stepsister over the course of several years. DCS referred Father for a psychosexual evaluation, and the superior court ordered future visitation be supervised.

¶11            The psychosexual evaluation was completed in May 2019. Dr. Leclerc opined that Father's refusal to take a polygraph about his sexual history "combined with his objective test results indicating he holds sexual interest in females ages 5 or younger, is extremely concerning and would negatively impact his ability to safely parent a child." She elaborated that "a child placed in his care could be at risk for sexual abuse." Based on Dr. Leclerc's report, DCS joined the GAL's severance petition. The superior court postponed the severance trial to July 2019 to allow Father time to further prepare given this new information and DCS's change in position.

¶12            Father participated in a second psychosexual evaluation the next month. Dr. Delatorre found that Father was sexually interested in prepubescent children and that he was "typically . . . unable to delay gratification, often acting on impulses with insufficient deliberation and poor judgment." Dr. Delatorre agreed with Father's previous diagnosis of "borderline to extremely low [intellectual] functioning," and noted "serious concerns about his decision-making, ability to adapt to increasingly difficult situations, and overall judgment." In light of this assessment, Father was given an "extremely guarded to poor prognosis" At trial, Drs. Leclerc and Delatorre both testified that Father could require at least a year of further participation in services before he could begin to parent a child with special needs effectively.

¶13            Following the trial held in July 2019, the superior court found that DCS had proven statutory grounds for termination on the basis of mental deficiency and fifteen months' time in care and that termination was in the child's best interests. Father timely appealed.

## DISCUSSION

¶14            "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz.

279, 284, ¶ 24 (2005). Even fundamental rights are not absolute. *Id.* A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance and finds by a preponderance of the evidence that severance is in the child's best interests. A.R.S. §§ 8-533(B), -537(B); *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 7 (App. 2016). The superior court is entrusted with a great deal of discretion in weighing and balancing the interests of children, parents, and the State. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160 (1982).

**¶15** We will not disturb the court's termination of parental rights unless its factual findings are clearly erroneous—that is, unless no reasonable evidence exists to support them. *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 78–79, ¶ 9 (App. 2001). Instead, we interpret the evidence and reasonable inferences in the light most favorable to affirming the court's order. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008).

## I.      Fifteen Months' Time in Care[2]

**¶16** The superior court may terminate parental rights if, despite DCS's diligent reunification efforts, "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement" for fifteen months or longer and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8- 533(B)(8)(c). The circumstances a parent must remedy are those existing at the time of severance that prevent the parent from being able to provide for his or her children. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007). At the time of the termination hearing, the child had been in out-of-home care for a cumulative total of thirty-seven months.

**¶17** Father asserts that he was able to remedy DCS's substance abuse concern. The superior court agreed. However, Father also argues the record did not support the court's findings that Father failed to remedy his inability to meet the child's medical needs. We disagree.

**¶18** Here, sufficient evidence supports the superior court's finding that Father had not remedied his inability to discharge his parental

---

[2]      Because we affirm pursuant to the statutory ground of fifteen months' time in care, we need not address Father's argument pertaining to the ground of mental deficiency. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

duties, particularly regarding the child's heightened needs. At trial, Father admitted that he was not very familiar with the child's diagnoses, nor which services and treatments the child required. The court heard testimony that the boy would need more than a minimally adequate parent to address his special needs. Father, however, has "borderline" or "extremely low" intellectual functioning. Considering this deficiency, three doctors testified and expressed concerns about Father's ability to parent the child at that time.

**¶19** Father also asserts that the record does not support a substantial likelihood that he would not be able to exercise proper and effective parental care and control in the near future. We disagree.

**¶20** DCS offered Father a variety of services to help him develop the parenting skills, including substance abuse testing, substance abuse treatment, counseling, a bonding and best interests evaluation, two parent aides, supervised visitation, a psychological evaluation, two psychosexual evaluations, and transportation. DCS met its burden to make diligent efforts to provide reunification services by providing this array of services to Father. The services offered did not remedy Father's inability to adequately parent his son.

**¶21** Even if Father had participated in more services, Dr. Delatorre testified that Father's intellectual disability render him unable to apply learned information effectively. Drs. Leclerk and Silberman agreed that Father's intellectual functioning impairments will remain unchanged in the near future and that his mental condition will continue for a prolonged time. Aligning with this testimony, the superior court noted in its termination ruling that "Father's intellectual functioning is unlikely to improve—ever."

**¶22** On this evidence, the superior court found that despite DCS's diligent efforts to provide appropriate services, Father failed to remedy the circumstance causing the child to be taken into DCS care, and he would not be able to remedy it in the near future. The record supports that finding.

## II. Best Interests

**¶23** Father argues DCS presented insufficient evidence to support a best interests finding. We disagree.

**¶24** In considering whether termination of parental rights is appropriate, the superior court must find termination is in the child's best interests by a preponderance of the evidence. *Alma S. v. Dep't of Child Safety*,

245 Ariz. 146, 149–50, ¶ 8 (2018). Termination of parental rights is in the child's best interests if the termination would benefit the child or if the continuation of the relationship would harm the child. *Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 572, ¶ 9 (App. 2018) (internal citation omitted).

**¶25**      Once the superior court's focus shifts to the best interests analysis, the "foremost concern . . . is protecting a child's interest in stability and security." *Id.* (internal quotations omitted). The court also considers whether the current placement is meeting the child's needs and the availability of an adoptive placement. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998) (internal citations omitted). "The existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not dispositive in addressing best interests." *Dominique M.*, 240 Ariz. at 98–99, ¶ 12.

**¶26**      Here, reasonable evidence supports the superior court's determination that terminating Father's parental rights would be in the best interests of the child. The court heard testimony that Father's mental deficiency left him unable to provide adequate parental care. At the time of trial, Father was still not fully aware of the child's diagnoses and treatment requirements. Furthermore, Dr. Leclerc opined that a child placed in Father's care could be at risk of sexual abuse because of Father's sexual predisposition.

**¶27**      The superior court also heard evidence that termination of Father's rights would benefit the child. The child is in a licensed foster home where his needs are being met. The placement provider attends regular doctor and behavioral health appointments. The home is free of neglect, abuse and substance abuse, and would provide the child with permanency and stability because the family wishes to adopt him. The case manager also testified that it would be detrimental for the child to remain in care without permanency.

¶28        In light of the evidence presented, the superior court did not abuse its discretion by finding that termination was in the child's best interests.

**CONCLUSION**

¶29          For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:      AA